May it please the court, my name is David Symes. I represent Jack in the Box in this appeal, and I am going to reserve 10 minutes of my time for the rebuttal and response to Mr. Egan's side of the case. Okay, so I'll sort of, we'll consider that aspirational, but we'll get through this. Indeed, indeed. Thank you. I'm going to start with, so Jack in the Box was the first to appeal, which is why I'm standing here first. And our appeal is primarily, if not exclusively, on the WBF willfulness issue. And I would like to start with a brief factual overview of that issue. For a statutorily relevant three-year period of time, Jack in the Box made what were called WBF, Worker Benefit Fund, overdue. So on that issue, you lost it summary judgment, so the jury didn't decide willfulness. You're correct, Your Honor. And so you're saying there was a triable issue, essentially, and the jury didn't get to hear it. That's correct. So if you're right on that, then it would have to go back to have the jury decide willfulness. You're correct, Your Honor. Yes, that's our belief. And the overdeductions were made from that relevant time period from approximately 2,500 class members. Deductions were made in fractions of a cent because they were from each paycheck, and it was based on a formula that came out of the overall assessment that the State of Oregon made. And most of the employees had less than $10 in deductions over this time frame. Counsel, let me sort of stop you here for a second. I understand the other side is maybe saying, how can it be that the right hand didn't know what the left hand was doing? In other words, there are some folks that knew, and now you're saying, well, no, you know, there's a factual issue. Maybe they didn't know, and it shouldn't have been cited as a matter of law. That is correct, Your Honor. And, in fact, nobody knew until Mr. Egan's lawsuit was brought and depositions happened. The first time anybody really knew was when Barb Klusak, who was the payroll manager for Jack in the Box, was deposed by Mr. Egan. This was in 2012. And it was at that point that the knowledge of this overdeduction really hit. Now, I appreciate your point that, well, wasn't there an earlier time potentially when knowledge existed? And my answer is no. Really, there was not for a variety of reasons that are outlined in our brief. But basically, and that was kind of the point why I wanted to focus on the fractional nature of the overdeductions, they were so small that nobody, not a single plaintiff, not a single class member, nobody at the company, was aware of this until it was revealed in the light of litigation. So is there evidence in the record how this Lawsome program worked? Specifically, how is it possible that the program continued to deduct the same amount from employees when the rates changed but decreased the amount paid in by Jack in the Box when the rates changed? And how is it possible that Jack in the Box did not know the program was doing this? So that kind of talks, that's what the issue is, right? It really is the issue. I mean, I think Your Honor is asking all the right questions. Thanks. Well, I mean, for what it's worth, I'm here to tell you what I think. And the answer to your first question is no. There is no evidence in the record of how Lawson works from a kind of a programming standpoint or a sort of a calculation standpoint. I mean, it just wasn't developed in the record by the parties. So it was paying the right amount but deducting a larger amount. So for the first year in question, 2003, it was set to deduct at the right rate of employees. So answer my question. I'm sorry? Answer my question. Because as I understood it, they were deducting a larger amount but paying the correct amount. Why can't we just say we're imputing that knowledge? The company was paying the right amount to the State of Oregon. You're correct. That's what I refer to as the overall assessment. Sure. But the deductions, and that entitled Jack of the Box to take one-half of that overall amount from employees. That's statutory. That's the program. And because the program, the Lawson program, did not change the calculation from 2003 to 2004, it over-deducted. And how does, I mean, if you decide that imputation of knowledge is proper, I would beg to differ. I don't think that's proper. It's not what the law says. The law says the standard is willfulness, which is knowing, voluntary, and intentional without inadvertence. So I don't think that it's proper to impute knowledge. And still, I understand that. I guess my question is, how could it be that you were paying the correct amount yet deducting a larger amount? How could it be that, if not intentional? Because nobody knew it was happening. And this is not developed in the record, but because nobody at the company took responsibility for the Lawson component of things to go make sure that got changed. Because maybe the Lawson component glitched and miscalculated. So do you pay separately to the state than what the deductions are? Absolutely, Your Honor. Totally different. So you get a bill for what's owed to the state, and Jack in the Box paid that. But you deduct using the Lawson. From the employee side. That's roughly correct. I would say we don't get a bill from the state. We get an assessment rate. And then we are supposed to go do a calculation. We being, in this case, the tax department of Jack in the Box, goes and looks at how many employees they had over some period of time, and based on that rate, figures out what is owed to the state. Then that total amount is then statutorily, Jack in the Box is statutorily entitled to take 50% of it. But that seems to be sort of willful ignorance. You know, just separate your departments aside, not know what's going on on the other side, and therefore we're never going to really know, oh, no, surprise, we were underpaying some folks, or over-deducting some folks. I mean, it seems, it stands to reason that this, and you may be right. You may be, it might be clearly a factual dispute, and therefore it goes back. But it just, it seems incredulous, at least, that you wouldn't know what was going on, even though you were paying the correct amount and deducting a larger amount from the employees. I don't know how to respond to that. I totally disagree. I do think it is a factual issue, no matter what. How much money are we talking about here? In terms of the over-deductions, there was a total of about $13,500 over a three-year period for approximately 2,500 employees, I think. I think that's what really boils down to me. You have a company that was basically leaving business in, I think, 2010, and then it got franchised, is that right? Yes, Your Honor. So basically it was shutting down. Your employee indicated nobody knew. You said that was first discovered, I think, in 2012, I think, when Mr. Egan did a deposition. You have, he said nobody responded. Clear factual distinction, an important distinction, unless the imputed issue is the law. This is a classic misuse of the summary judgment approach from your perspective, right? Classic, yes, Your Honor. It needs to go back to a jury. Classic. They'll put on their part, you'll put on your part, you'll respond to my colleagues' questions, but none of that is known now. The trial judge appears to just have said, hey, this is it, and it's an important point. Was it willful? Nobody knows in terms of a trier of fact, except the judge, who should not be doing it at this point. Is that your position? That is my position. That is Jack Lebox's position, yes. And that you might lose at trial. Of course. You just shouldn't have lost at the gate. To Judge Mendoza's point, maybe it's a thin case. I don't think so. But I hear you. I see that somebody could think that reasonably. So we could lose. I think we'll win. But, yes, that's the whole point. A trier of fact has to look at this. As to the last final pay damages theory, you assert that Judge Hernandez improperly reconsidered Judge Brown's ruling after the case was reassigned, but pursuant to Amaral v. Connell, which is the Ninth Circuit case, rulings made pretrial may be modified, even if the case is reassigned to another judge. So I guess I'm not seeing your point there. I can change my mind. And I can change and someone else can change it when they can say that's not right. So you're just saying because someone said it, it's over and done. How is this case not governed by Amaral, which says you can do it? I'm not remembering the Amaral case, Your Honor. And I do know the general rule that district courts are afforded wide latitude to change prior rulings, even of prior district courts. The difference in this case is that Judge Hernandez found, as a matter of fact, that the plaintiffs had waived those claims in the summary judgment proceedings before Judge Brown. He then went on to say that he thought justice required that he return those claims to the case. And the problem is, is the standard that should have been used, in our opinion, is manifest injustice. That is what the cases we cited say in terms of the ability of a district court to change another district court's opinion. Can I ask a question about the prejudgment interest? You take the position that Oregon law gives the courts the discretion to reduce prejudgment interest payments. But I don't see any language in the statute that says that. I don't see any language from other circuits that say that. It seems like what the law says is you've lost the use of your money and we're going to pay you for it. What's your best authority for your position that because of, in your opinion, the delays, in quotes, on the part of the other party, that there's an ability to reduce the prejudgment interest, whatever it may be in this case? The best authority is extra-jurisdictional. It is, in several cases, extra-jurisdictional outside of Oregon. In other words, I agree with Your Honor in not seeing it in Oregon law. Isn't the statute really clear, though? It doesn't seem to contain any exceptions.  I'll admit that. But there's always an exception when fairness really dictates. You sound like a lawyer. That's the first I've heard that. Your Honor is correct about what he's seeing, and we believe, though, that the facts of this case are such that, for example, a lot of the interest is for time spent in the litigation of Jessilee 1, what we refer to as Jessilee 1, which is the case that got dismissed. Why should Jack in the Box, as a matter of fairness or anything else, have to pay interest on that? Well, the statute seems, from my perspective. A pesky old law is the answer to that one. It seems to be saying if money is owed, and you don't pay that period of time, they're entitled to the interest, basically. It doesn't have any exceptions for Jessilee 1 or anything like that. Isn't that a correct reading of the statute? I believe it is. Okay. You're basically conceding that point, then. I still think you have discretion. I do. Why? Excuse me? Why would you have discretion? From extra-jurisdictional cases that say, even in clear cases of clear statutes like we're talking about here, when the facts warrant, courts — But the cases you cited, with respect, deal with different statutes. They're worded differently. Absolutely. And I think you're saying you agree that the Oregon prejudgment interest statute is quite clear. There are no exceptions. I do agree with that. And if that's true, then we don't even get to extra-jurisdictional law, do we? I believe you're probably correct. Okay. Thank you. Can I ask you a separate question about the shoes? And going to your point about the first issue being, you know, seems to be, according to your argument, there are some factual issues that shouldn't have been decided by the judge, then I guess why isn't it the same case that it shouldn't have decided the issues with regards to the shoes, and whether or not there was a benefit that was given to Jack in the Box, whether or not the indemnity that was being given, something that should have been decided by a jury, shouldn't that have gone to the jury as well? I do not believe so, Your Honor, and here's why. Why? The WBF question is really a pure question of fact, I believe. Well, but the thing is, the question is whether the shoe requirement benefited the plaintiffs seems like a disputed question right for jury consideration, because you could make an argument that the plaintiffs overpaid for their shoes so that Jack in the Box could collect a rebate and indemnities not for the benefit of the employee, because you've got that $2 issue. So, you know, what's good for the goose is good for the gander here. I generally agree with that principle, but not here.  Well, no, I do. You were the goose before and now you're the gander, but it's like, yeah. Why? Because the statute that we're talking about now on the shoes talks about for the employee's benefit. There was undisputed evidence in the record that the employees benefited. They got to keep the shoes. They got to wear the shoes outside of work. I went back and I looked at the shoes here, and with all due respect to the shoemaker, I mean, people were going to go out there and wear these shoes out, I mean, because that's the argument that they were using these shoes for their own benefit. Again, I saw the shoes, and are you telling me that folks were going to run out and get these shoes so that they could wear them out? I mean, what's your argument? Anything like that, Your Honor. No, I don't believe that's the case. There was disputed evidence from the plaintiffs themselves as to whether they liked the shoes. But the reason the employer, there's an argument, the reason the employers picked the ones that cost more is they get $2 back and they get indemnified because there's evidence in the record, my understanding, is that these people were slipping and falling at a 25 percent higher rate than other people were slipping and falling. And if your people slip and fall, it costs you money, right? You had lawsuits for that. So if this other, for the $2, you get the rebate, and you also get whatever the shoes were called, that they'll indemnify you for people that slip and fall in them. Jack of the Box has not appealed the verdict for the kick, what Mr. Egan refers to as the kickback, the $2. We're paying for that at some point. But you're appealing that, but you're arguing that the court should exclude class members, well, I'm sorry, no, but they're not appealing that, but you're saying that it's for the reasonable benefit of the employees, that there's no disputed fact on that. I'm saying that there was undisputed evidence that there was benefit to the employee. Well, yes, but that doesn't mean that there wasn't benefit to the employer. There might have been, but the statute allows that. And the reason we know that is because it's not for the exclusive or the sole benefit of the employee. And the reason we know that's why you don't interpret this section of the statute that way is because a section two sections down, when it talks about employers who give loans to employees, it says the employers can deduct from loans, from paychecks for loans given to employees, but only if the loan was for the sole benefit of the employee. So that I understand your argument. What you're saying is that there was some benefit to the employee, and because there was some benefit to the employee in the use of the shoe, therefore it could have been decided as a matter of law is what you're saying. I'm saying because there's some benefit to the employee, but the fact that there was some benefit to the employer is not a relevant inquiry. The question is whether there's some benefit to the employer. I think we know your argument, but you're eating your time. I see that, Your Honor. I'm very worried about that because I've almost used all this time. Okay. Well, I'll make proper adjustments. Okay. Thank you, Your Honors. Let's hear from the other side. Good morning. Good morning, Your Honor. My name is John Egan. I represent the plaintiffs. May it please the Court. I'll address a couple of things from Mr. Symes before I start in with plaintiff's assignments of error. On the shoes, the trial court did find that as long as it gives some benefit to the employee, it doesn't matter if it also benefits the employer. But if you look at the legislative history of this deduction section, we put that in that legislative history at SCR 273 to 279. The Boley administrator who proposed this bill testified that it reflects the legislative intent that whatever the deduction is, it does not go to the benefit of the employer, but to the benefit of the employee. Okay. I don't really care about legislative history until you show me the text is ambiguous, and then I'll peek under the covers. Well, I think that's the rule for interpreting federal law. Unless you're talking to Justice Scalia. Well, but in Oregon, under State v. Gaines, the actual rubric for analyzing Oregon statutes is that you do include legislative history whether or not there's relevant legislative history before having to find that there is ambiguity. So I'll just point out that one thing. Okay, thanks. Sure. And then for the Workers' Benefit Fund, we pointed out the case of the willful computer from the bankruptcy appellate panel. Oregon Supreme Court law says that penalties aren't meant to protect employees from careless employers as well. So there has to be a level of knowledge that's below intentional. Counsel, I understand your argument, but don't they raise a good point? I mean, it really does come down to this factual dispute, and for the judge to have decided it as a matter of law, that may not be correct. I mean, I understand what you're saying. I don't think that any reasonable jury can look at the fact that they knew what the correct rate was. Any reasonable jury? Yeah. So that's a remarkable statement. I mean, you have a tiny, tiny, tiny amount of money for lots and lots and lots of people. You have an employee who says, hey, we didn't know about this. My colleagues have brought up the point, how could this be? It's a machine. It's a program. Why didn't he get it right? But it's all factual. And you're talking about a penal statute, a penal statute. I'm surprised that you are pushing back on this idea that a jury ought to decide this, unless they're going to give the right to the judge to be the trier of fact. This is an important issue. It's a very important issue. But there are so many things that it seems to me at least some juror, some reasonable person could disagree with you. Doesn't that argue that at least in this point, this needs to go back for a trial before a jury on this point? Not the rest of it. There are lots of other things, but this one. I mean, I understand the point that all of your honors have made on that. I understand how a judge could look at it both ways. But willfulness under Oregon. Jurors and judges are not the same? I think that when presented with the proper legal definition of willfulness under Oregon law, no reasonable juror could find that this was not willfulness. But with respect, counsel, while you're a good lawyer, you're going to make your arguments and you're going to say, oh, this, this, this, this, this. You're going to make his arguments and say the opposite. And then the jury will decide. You may be persuasive. You may win. But it's up to them to decide, not the trial judge, is it not? I mean, I disagree with the result. I agree with you that that's the process that the judge goes through in deciding a motion for summary judgment. Well, let's say we go back in conference, which we haven't conferenced yet. We go back and just hypothetically let's say that Judge Callahan doesn't think that the willfulness standards met. Judge Mendoza thinks it has. Judge Smith thinks it has. But I'm reasonable. Doesn't that tell you right there? It's sort of like when I dissent on a case. Well, it's like when I dissent on a case and then my colleagues say, well, no reasonable person could think that. We're looking at, so if we don't agree on it, that's almost like we're the reasonable jurors there. Now, I don't know how we feel about it. We haven't discussed it. Absolutely. And if when you go in conference you decide to send it back to the trial court, we will happily retry the case. And you would do an excellent job. Oh, thank you very much, Your Honor. I appreciate that. So those were the things I wanted to address with the things that Mr. Symes said. On plaintiff's first cross-assignment of error, that's the denial of certification on the unpaid meal breaks class. Now, the meal periods went through several rounds of briefing in the trial court. The trial court denied certification each time based on a different reason, and so each time when that particular reason that was given was reversed either by the Oregon Court of Appeals or the Ninth Circuit. But I guess what I understood the district court judge to ultimately conclude is that the folks from prior to 2010, they were paid. So then what's left? Weren't they paid by the employer? No. According to what the law was at the time? No. No. The judge concluded that prior to 2010, there was no requirement in the rule that employees receive pay for shortened meal periods. We're alleging that that was an erroneous legal conclusion, that that's not what the law said prior to 2010. I mean, in 2010 — But having said that, aren't you agreeing that at least according to what people understood at the time, that the employer did that? In other words, the law was such that they didn't have to do other than what they did at that time. No. No, they did. So here's what happened in 2010. I thought you were arguing that the change was retroactive and then that's — Well, so there wasn't. So MASA interpreted certain language in that administrative rule, that interpretation is retroactive under Oregon law. So the words, me, always meant what MASA said they meant. That was the second denial of class certification. Then the Ninth Circuit said, no, Oregon applies legislative gloss on statutory language retroactively. I want to come back to this point because I want to make sure that I'm understanding. You're saying that they did not get paid according to what the law was prior to 2010. Absolutely. Point me to that in the record. At some point today, I need you to point that to me because I'm not sure that's accurate. Yeah. Well, so what we argued was prior to 2010, the language was the same. The cell-provide language that MASA interpreted, I mean, the trial court said MASA was interpreting the post-2010 version of the rule, but the language that they interpreted was the same both before and after that change. But if the statute changed but the requirement was the same, was it a superfluous change? Well, no. When Boley put that change in, both their administrative report in the Oregon reports and the declaration by the Boley Wage and Hour Administrator that are in the record both said, we're doing this to clarify that this must be paid. But nobody understood it before that time, right? Well, we think they did. I mean, there's a couple of— Why the clarification? Because apparently there were some people who didn't understand. There was a split in authority before that. Okay. So at least it wasn't willful, right? Because they didn't know what the law was. It was confusing. I don't think that's what the standard for willfulness is in Oregon law. It's a criminal statute. Well, no. This isn't a criminal statute. They're called penalty wages, but it's mainly to deter and get—to allow employees to be paid quickly and to deter other people from not paying them quickly. But with respect, you're the Oregon lawyer, but I thought that Oregon law was quite clear that when wages are owed and they're intentionally not paid, that's a criminal offense. Is that wrong? It is. Okay. But this is a civil case. I understand that. But it's treated for purposes of enforcing the law as if it were a criminal statute, right? No. Because the willfulness standard—there's a different standard for willfulness and intentional on the criminal side. In Oregon, willfulness just means reasonable lack of knowledge of the historical facts. So when cases in Oregon have found that things were not willful, it's been when, like, people sneak back into work and do a bunch of overtime that the employer doesn't even know about. They don't know the historical facts that create the liability. If they know the historical facts but they think that they can offset some other debt that the employee owes or they think that they have an affirmative defense that they don't pay it, if they're wrong on the law but they know all the facts that end up creating the liability to pay wages, that's willful under Oregon law. It's a very kind of niche definition of willfulness that's developed over time specifically for— I respect that, but what I'm thinking is if you're the employer, it's your law firm, and you don't know what it is, but you're hoisted on your own petard if you choose the wrong box, right? And it's a big penalty. Is that what Oregon law requires? Yeah. I mean, that's what the penalty wages are. Because there's specific Oregon administrative rules that say that you're presumed to know the requirements of the law. You can't hide behind, well, I thought that— Everyone does. Sorry? Everyone does know. Oh, of course. Of course. We all know that. So that's what we say about the meal periods. The law was the same before and after that change. Boley said, we're going to clarify that you have to pay for these short meal periods. And the other two changes that they made at the same time, they said, we're making this change to conform to federal law. So that difference between clarify and conform— Are you making a retroactive argument or not? The applicable language existed both before and after the 2010 change. MASA's interpretation of that language is applied retroactive. Well, in your reply brief, you assert the rule that the employers must pay for short meal breaks. It could apply retroactively. But I did not see that argument raised below or even in your opening brief. So isn't that retroactive argument forfeited?  No. In both of the times that it came up, when we specifically moved to reconsider the trial court's denial of certification, because the trial court had denied certification by saying, I'm not applying MASA retroactively. And we moved to reconsider saying, well, the Ninth Circuit in this footnote has said that Halper and v. Pitts requires you to apply cases retroactively. So did you ever argue in the district court that Jack in the Box breached the on-duty meal policy agreement? And if so, where in the record can I find those arguments? Yes. We did it in the complaint. We did it in the pretrial memo. Well, my reading of the record indicates that the unpaid break claims were pleaded and tried as a regulatory violation. Where in the record did you clearly articulate a breach of contract theory? Yeah, that's the difference. Because in Oregon, you don't have to plead breach of contract to bring a wage claim. All wages that are due are as a result of the employment contract for the unpaid wage statute. There's another set of statutes for minimum wage and overtime where the statute provides the minimum or the statute says how much you have to be paid. But Erickson v. American Golf Corporation says unpaid wages for a wage claim are the wages that are due under the contract. So for unpaid wages, if a contract says you're owed this amount, then you're owed it for the wage statutes. And I should say on the minimum wage side, both the Buero case, Buero v. Amazon, that this circuit referred to the Oregon Supreme Court and they answered the question, and Oregon Administrative Rule OAR 839-020-0043 sub 3 says that even something that wouldn't otherwise be hours worked for the purposes of minimum wage and overtime becomes hours worked if the parties agree that it is hours worked. And that's the same rule under the Federal Code of Federal Regulations. So that's where the on-duty meal period agreements come in because even if Jack in the Box says the statute didn't require us to pay for that at the time, when they tell all their employees and require them to sign it when they come in, if we make you come back early from a meal period, we're going to pay you, that then becomes hours worked for purposes of the hours worked statutes. So that's the meal period portion. On the shoes, I think there's a couple of different statutory problems with the trial court's decertification. First is we've argued about whether they're for the employee's benefit. We're not going to argue about whether something was authorized in writing. The jury found that the plaintiffs did authorize these deductions in writing. This defense now solely turns on whether they were for the employee's benefit. So we've talked about that. But the trial court also then said, well, if it's authorized in writing, then it can't be a minimum wage or overtime violation. And that's wrong. The minimum wage and overtime statutes have lots of other requirements that you have to meet, even if something is authorized in writing. Uniforms can't be deducted from the minimum wage, regardless of whether they're authorized in writing. You can't charge more than the cost to the employer, which was done here. That's unequivocal. You have to make the full deduction in one payday. These were made over three or four paydays. And it has to be voluntary and uncoerced, which does not apply to regular wage deductions. So employers and employees can make lots of deductions from wages that are legal under the wage deduction statute. So high earners, if they have a deduction that you authorize, that's a fine. But minimum wage employees, you can't make the deduction unless it meets all these requirements. Judge Brown initially said, well, obviously, this doesn't meet those requirements. Judge Hernandez didn't really explain why he said that authorized in writing for the wage statute automatically means that it qualifies under the minimum wage and overtime. And that applies to both the decertification and the motion to correct the jury verdict that Jack in the Box filed after the case. I'd like to reserve the remainder of my time, if that's all right. Okay. Thank you. Thank you, Your Honors. This is a lot harder than I thought it was going to be. Well, that's okay. I'm going to give you a couple extra minutes, and I'll give him a couple extra minutes. So that gives you a little, four minutes. Thank you. I'm going to go to meal breaks first, then. Mr. Egan said the language is the same between 2010, when the regulation changed, and prior. That is unequivocally false. In the record at docket 36.1, pages 86 and 90 are the regulations that we're talking about. The page 86 is the 2009 regulation, and in that regulation is 050, sub 2, sub B. Counsel, what's the ER number? What's the ER number? Do we have that? A12. Thank you. A12 and A16. And A16, so the language is totally different. In 2010, the following provision was added. Except as otherwise provided in the rule, if an employee is not relieved of all duties for 30 continuous minutes during the meal period, the employer must pay the employee for the entire 30-minute period. Prior to 2010, that was never in the law. And, to some of the judge's questions, it was never decided to be in the law. In fact, the Oregon Supreme Court case of Gaffuris, there's not even a private right of action for a failure to provide a meal break. Now, if you bring somebody back and make them work and don't, prior to any meal break, and don't pay them for that, well, that's a problem, but that didn't happen in this case. The plaintiff's all testified. Did your friend on the other side argue retroactivity? That is not clear, Your Honor. We had that same question. I think he did previously. It's not clear to me that he preserved it for appeal. But, look, it doesn't matter because Maza's retroactivity is irrelevant. Here's why. Maza decided the question, those same regulations, if you look at sub 2A, every employer shall provide to each employee a meal period, shall provide. That's the language Maza interpreted. And it interpreted whether, essentially, whether employers have an obligation to police their workforce and make sure that an employee gets a meal break, or whether just the opportunity is enough. Shall provide was determined to be, essentially, the employer must go do it, give the 30 minutes. The whole question that we're talking about here is under subsection B, a totally separate subsection, and that was brand new to the law in 2010, didn't apply to any of this case, doesn't matter. And so, he's just wrong. There's no easy way to say it. Okay, you have a minute and a half of what I'm giving you extra. Okay. You might want to use that wisely. I wanted to go back to willfulness because Mr. Egan said that the willful standard, I wrote down a quote, he said it's a reasonable lack of knowledge on historical facts, end quote. That's what he said the standard was. I have never seen that articulated in any of the cases. I cannot represent that there's not a case somewhere in dicta that makes a point like that. But the standard is almost always. What does the jury instruction look like? It was, well, we didn't have one. We didn't have one, yeah. But you have standard jury instructions, right? You're correct. I do not know if there's one on this one off the top of my head. But the cases are all very consistent. Now, they go all over the map in some ways on the actual application of the standard. But it is merely indicates that the act of remission, willfulness merely indicates that the act of remission was purposeful and not the product of inadvertence. In another case, it amounts to nothing more than this, that the person knows what he is doing and tends to do what he is doing and is a free agent. I have never seen a standard articulated like what Mr. Egan just argued to this Court. Again, maybe there's some language like that in one case somewhere. But I don't know. I'm not aware of it. It certainly wasn't analyzed here. Do my colleagues have any? We don't have any additional questions. Thank you, Your Honor. I gave you two minutes extra. You're done. Thank you. Okay. I'm going to give you, I'm going to add two minutes to yours. Or when the light goes on, you can go up two minutes over time. Thank you, Your Honor. I wanted to point out that the meal language that Mr. Symes, my friend, pointed out, the language that GAFR interpreted before 2010, it said, the employer shall provide a meal period and an appropriate meal period is 30 minutes long or it's a time to eat that's not deducted from the employee's hours worked. So you either have to give them 30 minutes or you can't deduct it from their hours worked. That was pre-2010. After 2010, it just changed the formulation. It says, if you don't get 30 minutes, you have to pay them. But that's the same. Not deducting it from your hours worked is the same as saying you have to pay them. That's the clarification that Boley put in because there were cases that had gone either way. And the case that specifically interpreted it this way was in 2007. It's a California case, but it was out there saying, it's a reasonable inference that when an employer has deducted pay for meal and rest periods, the employee is entitled to recover those wages because the rule expressly prohibits such deductions. That's Wren v. RGIS. Well, is there a difference that before in 2010, they would just get paid for the part that they got called back in? Say, like, you go out for your break, and then suddenly the store, everything breaks loose, and they say, you don't get the rest of your break. We need you back on the floor. Now, my understanding is that then it would come down to you subtract the minutes that they lost. Then after, if they don't get the full thing, then they're paid for the whole 30, not just a part of the 30. Am I wrong? Well, I mean, some trial court opinions did interpret it the way you're saying. Okay. But it says if you don't get the full 30 minutes, then it can't be deducted from your hours worked. And that, by the way, under the Buero case, Buero v. Amazon, the Oregon Supreme Court said that Oregon has adopted the federal standards on these hours worked, and that's the same rule under the FLSA. If you don't get 30 minutes, you're supposed to be paid for your lunch. Now, the GAFRA case that my friend referred to, that said that if you work 8 hours and get paid for 8 hours, you don't get extra time because you didn't get a meal period. You know, that's not the case that we have here where they worked for 7 hours and 35 minutes, and they got paid for 7 hours and 35 minutes, but they were supposed to get paid for 8 hours. That's the difference. And then the last thing I'll note, under willfulness, I think the case that my friend was looking for. Do you know what the jury instruction looks like on willfulness? No, I don't. Okay. But that's what, if it had gone to the jury, that's what the judge would have instructed the jury, right? Probably. I mean, Wilson v. Smurfett is the 2004 Oregon Court of Appeals. I was a trial judge, so I know how to do jury instructions. Exactly. So as we get together on that. It says, an employer willfully fails to pay wages owed at termination when it knows or reasonably should know all of the facts that trigger the obligation to pay. A reasonable lack of knowledge of those historical facts immunizes the employer from penalties. So that's the case that my friend was trying to remember. A reasonable lack of knowledge of historical facts is what makes it not willful. If you know all the facts, then they assume you know the law. That doesn't sound like a jury instruction. It's not. I know, but I'm just saying because we're arguing whether the issue of willfulness should have gone to the jury, that would be the law that the judge would give to the jurors to decide that. I've never seen a jury instruction that says a reasonable knowledge of the historic. I mean, that would blow me away. I don't understand that. Well, oftentimes in my experience, we usually end up using cases, language drawn explicitly from cases because that's the only thing that the parties can agree on in terms of dumbing it down in language that might help one side or the other. Okay. If the Court has no further questions. We don't. Thank you both for your helpful arguments in this. All right. Thank you. This matter stands submitted.
judges: CALLAHAN, SMITH, MENDOZA